[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 I. INTRODUCTION
A termination of parental rights petition was filed by the Department of Children and Families on November 30, 2001 wherein the Department sought to terminate the parental rights of Catherine G. who is the mother and Miguel G. who is the father of the three children, to wit: Keven who was born December 1996 who is now five years old; Alexis who was born March 1998 and is now four and Dessiree who was born July 1999 and who is now three.
Prior to the trial, specifically on June 14, 2002 father executed an affidavit in triplicate consenting to the termination of his parental rights after a full canvass was performed by Judge Levin who found that father's consent was knowingly and voluntarily made with the assistance of counsel and with a full understanding of the legal consequences and who thereafter accepted father's consent, although, deferred a finding that termination of parental rights with regard to father is in the best interest of these three children pending a decision as to mother's parental rights.
 II. HISTORY OF PROCEEDINGS
Prior to the neglect petition which was dated June 2, 2000 and which initiated the present file on these children, there were previous proceedings involving DCF in Superior Court for juvenile matters.
As to Keven, in December 1997, he was removed from his mother and father due to domestic violence in the home and living in deplorable conditions. He was adjudicated a neglected child and returned by way of an order of protective supervision to his parents' care on February 11, 1998.
As to Alexis, he was born two months premature and weighed only three CT Page 13293 pounds. While he was in intensive care, mother and father failed to visit him for a full month. At the time of Alexis discharge from the hospital, mother and father were homeless resulting in an order of temporary custody being issued on April 21, 1998 for both Alexis and Keven.
The children were adjudicated neglected and returned again by way of an order of protective supervision to the parents' care on June 5, 1998. Ultimately, mother and father were ejected from a homeless shelter due to not properly feeding or supervising the two children resulting in a third order of temporary custody dated July 30, 1998 and a subsequent adjudication of neglect. The children were returned again by way of protective supervision to their parents' care on December 24, 1998. As indicated on June 2, 2000, the petitioner filed the neglect petition as to all three children. At that time. Keven was three: Alexis was two and Dessiree was eleven months old.
The petitioner alleged that the children had been denied the proper care and attention physically emotionally or morally and that they were being pemitted to live under conditions or circumstances or associations injurious to their well being.
At the same time an order of temporary custody was issued by Judge Foley with a finding that all three children were in immediate physical danger from their surroundinus. The neglect petition and the order of temporary custody were prompted by a DC investigation which confirmed continuing physical violence between mother and father (resulting in an injury to the youngest child), inappropriate caretakers and a filthy, roach infested living environment.
The order of temporary custody was sustained on June 14, 2000 by Judge Rogers at the Child Protection Session in Middletown. On August 29, 2000 Judge Mack by way of nolo pleas for mother and father found the three children were neglected in that they were in fact living under conditions that were injurious to their well being and committed the three children to the Department of Children and Families for a period of twelve months.
Specific steps were ordered as per 46b-129 of the Connecticut General Statutes. On August 1, 2001 Judge Mack extended the commitment of the children to August 29, 2002 at which time the Court approved as a permanency plan for each of these three children; termination of parental rights and adoption.
On August 21, 2002 Judge Mack ordered that said commitment be maintained until further order of the Court. CT Page 13294
 III. ADJUDICATION
As indicated, father consented to the termination of his parental rights on June 14, 2002. Judge Levin on that date allowed the petitioner to orally amend the petition to state consent as the sole statutory ground against father. At the trial on August 22, 2002 this Court ordered the Petitioner to file a written amendment to that affect.
As to mother: Mother was well aware that the trial would commence August P 2002 and conclude on August 23, 2002. Mother has exhibited a history of sporadic appearances in this case. Mother was initially defaulted for her failure to appear on the plea date set for the termination of parental rights petition on January 2, 2002 by Judge Mack.
However, she did appear on February 6, 2002 with her Court appointed attorney and she did appear according to the file on June 14, 2002 at a pretrial conference.
On June 28, 2002 she left a message on the voice mail of the DC case worker, Mr. Martin, that she did not want to go to trial, liked the children's foster mother, and wished to see the three children for one last visit. She indicated to her attorney. Mr. Duhaime, on several occasions she was willing to consent to the termination of parental rights of all three children, but did not want to go to Court.
On July 22, 2002. Mr. Martin wrote mother at her confirmed current address and informed her of the trial dates. On June 30, 2002 he attempted to visit mother and left a note on the premises reminding her of those trial dates and offering her a ride to court. Mother did not respond to the attempts by Mr. Martin or her attorney to reach her.
This Court has reviewed all of the exhibits. (14) in number, submitted by agreement of counsel in addition to the case worker's affidavit dated June 2, 2000 which triggered the order of temporary custody of' the same date relative to which this Court has taken judicial notice.
The Court considered the testimony of Mr. Martin and has read the summary of facts accompanying the termination of parental rights petition. The Court finds by default in nonappearance for trial and from its review of the evidence that the petitioner has proven by clear and convincing evidence the statutory grounds alleged against mother, that is, her failure to rehabilitate within the meaning of section 17a-1
12 (j) (3) (B) (i) as to her three children. The Court finds that the CT Page 13295 Petitioner has proven by clear and convincing evidence the statutory grounds of consent as to father, as provided in section 17a-112 (i) Connecticut General Statutes.
 IV. REASONABLE EFFORTS
Pursuant to section 17a-112 (j) (l), the Court finds, one, that the petitioner has made successful efforts to locate mother and father. Each parent was furnished with a Court appointed attorney. And each more or less participated in the proceedings prior to the August 22, 2002 trial date.
Second, Petitioner alleges in the petition that the Petitioner has made reasonable efforts to reunite the three children with mother and father. Those efforts include referrals of both parents for substance abuse, evaluation and treatment, individual and couple's therapy, a domestic violence program. Kids Safe parenting education and a visitation program which included transportation, psychological evaluations and case worker services.
Prior to the filing of the latest order of temporary custody on June 2, 2000, petitioner referred mother and father to various parenting classes and arranged for the Birth to Three Program and Intensive Family Preservation,
This Court finds by clear and convincing evidence that DC has made reasonable efforts over an extended period of time (December 1997 through August 2002) to reunify these three children with their parents.
Third, the Court also finds by clear and convincing evidence and from reviewing all of the evidence that mother and father are unable or unwilling to benefit from said efforts. The Department has been involved with mother and father for nearly five years.
The problems which occasioned the initial DC involvement in December 1997 were domestic violence, lack of parenting skills, inappropriate adult caretakers and a deplorable and filthy living environment. Despite active involvement with the Department and despite accessing services arranged by DC, the problems which occasioned the order of temporary custody on June 2, 2000 (two and a half years later) were identical to those which triggered DCF's initial involvement.
Although, mother and father have taken advantage, albeit, sporadically, of couple's counseling and have been consistent in their therapeutic visitations with the three children, the evidence clearly CT Page 13296 showed they have not benefited from such services, have limited parenting ability and persist in denying responsibility for the neglect of their children. Those children have been in DC foster care since June 14, 2000, a period of over two years.
The Court also finds that the petitioner has made reasonable efforts since the Court's approval of the permanency plan on August 1, 2001 to implement said plan.
 V. DISPOSITION: Basic facts pertaining to the determination of best interest
As to father: while the children were residing with the father and mother. Father emotionally and physically abused mother: forced the children to live in squalor and allowed very inappropriate care takers for the children including a convicted sex offender.
As noted, father sporadically attended couple's counseling. He has, however, gained little or no insight as to the affect on these three children of the volatile relationship with mother. Despite removal of his children from his care, father continued to engage in criminal behavior and was incarcerated for six months since September 2001 for violation of probation, disorderly conduct and failure to appear.
Father neither documented employment or residence; has failed to undergo substance abuse and has not followed the recommendation the Court ordered evaluator, Dr. Grenier, to engage in psychotherapy. Although, father has consistently visited the children when not incarcerated he has failed to follow through on the suggestions of the visitation therapist and often terminated the visits earlier than scheduled.
Father has had a difficult time dealing with the children's behavior during supervised visits. Dr. Grenier during her evaluation in February and March 2002 noted that while father played well with the children and showed them physical and verbal affection and appeared to be an important parental figure to them, they showed no distress when separated from father and lacked significant emotional attachment to him.
Noting father's histrionic personality and unstable lifestyle Dr. Grenier opines that father, "may also find it difficult to move beyond his own problems and consistently give affection, support and acceptance to others." Dr. Grenier recommends termination of father's parental rights.
As to mother: Symptomatic of the volatile relationship that mother had CT Page 13297 with father was confirmation by petitioner in June 2000 that mother during an altercation with father threw a typewriter and a fan out of the apartment window and that while tossing the baby's chair. Dessiree was hit with the chair.
No word other than "squalor" (which the American Dictionary defines as "filth and misery") can describe the deplorable condition of the apartment which mother provided for these children. The description on page six of the affidavit which supported the order of temporary custody in June 2000 is appalling.
The Court has already noted mother and father's sporadic involvement in couple's counseling. Mother did participate in some individual counseling but ended that involvement when father was incarcerated in September 2001. Mother also did not follow through on psychotherapy recommended by Dr. Grenier.
In October 2001, sixteen months after her three children were removed from her care, mother was evicted from her apartment where she and an invited guest caused thousands of dollars in damages. The manager described the devastation as incredible!
On October 29, 2001, one month after father went to prison, mother received a suspended sentence and one year probation for larceny in the fourth degree and failure to appear. One year earlier, she received a suspended sentence and two years probation for two counts of credit card theft.
While mother has consistently attended weekly therapeutic visitations, she continues to demonstrate the lack of ability to supervise her three children and is unable or unwilling to employ the parenting techniques suggested by the visitation therapist. Mother's therapist from UConn's Humphrey Center felt that the mother lacked the ability to parent her three children in a healthy environment.
The therapist closed mother's case in February 2002 due to mother's lack of attendance. In early June 2002, mother had her weekly visit with the three children and has not seen them since, despite efforts by the Department to arrange a visit.
During Dr. Grenier's observation of mother with the children, the doctor noted that while the children enjoyed living with mother, they initiated no physical contact with her. Once the children left the closed confines of the evaluation room, mother became overwhelmed by the children's running around and touching things. As with father, the three CT Page 13298 children were able to part mother's company without difficulty.
Dr. Grenier found no emotional attachment of the children to mother. Dr. Grenier had doubts as to whether mother was perceived by the three children as their psychological parent as they appeared less desirous of pleasing mother than when Dr. Grenier observed them at an earlier evaluation in August 2000.
They were able to leave mother's company without difficulty. Dr. Grenier cautions that mother's "need for autonomy may take precedence over her capacity to care about and be truly affectionate with others."
Dr. Girenier recommends termination of mother's parental rights.
 VI. BEST INTEREST
Even though mother has been defaulted for her failure to appear at trial on the adjudication portion of the trial, it nevertheless remains the Petitioner's burden to prove that termination of mother's parental rights is in the children's best interest. And that must be proven by clear and convincing evidence.
Even though father has consented, the Petitioner must also prove that the termination of father's parental rights to these three children is in their best interest and that proof must be by clear and convincing evidence.
Pursuant to Practice Book Section 33-3, the Court may consider events prior to the filing of the termination of parental rights petitions and all events up to and including trial in the disposition stage of the trial.
Pursuant to section 17a-112 (k), in making a nonconsensual determination as to whether terminating a parent's parental rights is in the children's best interest, the Court must consider and make written findings relative to the seven factors set forth in said statute.
Said factors serve as guidelines to the Court's determination of best interest. In re Quaintram M., 60 Conn. App. 96, 104, cert. denied,255 Conn. 903 (2000). In making it's determination, the Court has reviewed, in addition to Dr. Grenier's psychological evaluation of mother and father with interaction with the three children, all of the other exhibits offered by the petitioner and submitted by agreement of counsel. CT Page 13299
In particular, the Court has reviewed the summary of facts, the two social studies and Dr. Grenier's evaluation of March 2002.
All three children have been residing together in their current DCF foster home since July 6, 2000, one month after their removal from their parents' care. Despite having consistently visited their children on a weekly basis since their removal (Father did not visit during his incarceration) both parents have not been able to alter their superficial approach to parenting and have not been able to employ the parenting techniques suggested by the visitation therapist from the Kids Safe Program. Both have continued their antisocial and criminal behavior and both lack the stability necessary to safely and developmentally parent their children.
The children are bonded to each other and to their foster parents whom they now refer to as "mom" and "Rob." The foster parents are desirous of adopting the three children and making them a permanent part of their family which includes mother father and adopted twelve year old twins.
The foster parents recently extended their kitchen and constructed an additional bedroom to provide a permanent and comfortable accommodations for these children.
Dr. Grenier stressed the children's need for permanency in a report six months ago. That need was reflected in the children's behavior during the visits with mother and father which, Dr. Grenier stated, suggested "that the children are experiencing confusion about their statuses which leads them to feel insecure and unstable."
Dr. Grenier concluded as follows:
"Mr. and Mrs. G. do not appear to have stable lifestvles at this time. And Ms. G appears to present some conflicting information about her substance abuse.
This needs to be addressed and she should receive substance abuse treatment as well as individual psychotherapy. Mr. G. should also receive individual therapy. Given these Factors and the children's need for stability and permanency, termination of parental rights appears to be in their best interest which precludes further visitation with their parents."
Dr. Grenier's professional opinion and recommendation was termination of mother and father's parental rights and that the children should remain permanently in their current Foster home. "the psychological CT Page 13300 testimony from professionals is rightly accorded great weight in termination proceedings." In re Nicolina. T., 9 Conn. App. 598, 605, cert. denied, 203 Conn. 804 (1987).
Keven has presently completed kindergarten and will be going to first grade. He has adjusted well to his current foster home and has established a permanent bond with his foster parents. Alexis had some difficulty behavior-wise adjusting, but he is now doing much better and is like his brother, permanently bonded to his foster parents. Dessiree has done extremely well in her foster home. She is reported to be a bit quiet and reserved but is very bonded to her siblings and to her foster parents.
There should be no further delay in the implementation of the permanency plan for these children, a plan which the State has clearly and convincingly demonstrated is in the best interest of these three children.
This Court finds that the Petitioner has proven by clear and convincing evidence that it is in the best interest of Keven, Alexis and Dessiree to termininate the parental rights of both of their parents
 VII. THE STATUTORY FACTORS
This Court has considered in making its determination as to whether termination of' the parental rights of their parents is in the best interest of these three children, and those factors provided in section 17a-112 (k) of the Connecticut General Statutes.
1. The timeliness, nature and extent of services offered
As noted. DCF referred both parents for counseling, substance abuse evaluations and domestic violence programs. The Department implemented a therapeutic visitation program via Kid Safe, to as it were, provided "hands on" expert training and feedback as to methods of properly and safely parenting these children. That program included furnishing transportation to the parents. Prior to the latest order of temporary custody (June 2, 2000) DC offered, and mother and father accessed parenting programs. Intensive Family Preservation services and Birth to Three services.
The Department since December 1997 has provided a wealth of referrals and services to mother and father, some ignored and some utilized. However, exposure to such services has not resulted in an ability of mother and father to properly and safely parent their children. CT Page 13301
2. Reasonable efforts to reunite.
Prior to the children's removal in June 2000, the Department had initiated three removals followed by three orders of temporary custody and three periods of protected supervision.
Various services were implemented by the Department during the period of each prior removal with the resulting return of children, that is, until the latest removal. Despite the prior history, however, the Department referred mother and father to various providers and implemented the therapeutic visitation program — all in an effort to accomplish the safe return of the three children to mother and father. Further efforts on the part of the petitioner would be fruitless, a waste of scarce resources and contrary to the best interest of these three children.
3. The fulfillment of Court ordered obligations
The Court ordered specific steps to both parents per section 46b-129
(j) on August 29, 2000, which provided a road map as to the manner in which mother and father might regain custody of their three children. Parenting, anger and domestic violence needed to be addressed by way of individual and family counseling; substance abuse also needed to be identified and dealt with: stable housing and income needed to be maintained. As noted mother and father did participate on and off in couple's counseling. However, the counselor reported little or no progress.
Father and mother both failed to follow through on the psychotherapy recommended by Dr. Grenier. Father refused to cooperate relative to substance abuse issues and failed to document his alleged employment and residence.
Mother terminated counseling when father went to jail. Both parents had continued their criminal and antisocial activities and neither has improved, even to a minimal degree. their capability of parenting of their children.
4. The feelings and emotional ties of the three children to their motheran (father and of the three children to their foster parents.
As to mother, as noted from Dr. Girenier's observation of the children with mother. mother became overwhelmed when the children's behavior got out of hand and she was unable to properly control that behavior. CT Page 13302
The children apparently viewed mother as an adult play mate: showed no emotional attachment to her and were able to leave her without difficulty. As to father, Dr. Grenier noted that although father played well with the children, father lacked any significant emotional attachment to them. And as with mother, the children had no problem leaving father's company.
As to the foster parents, the children have resided with them for over two years and are bonded to them. They are so bonded and connected to the three children that adoption is their goal.
5. The ages of the children
Keven is now five: Alexis is now four and Dessiree has just turned three.
6. The efforts the parent has made to adjust his/her circumstancesconduct or conditions to make it in the best interest of the children toreturn them to his/her home in the foreseeable future.
Neither parent is willing or able to provide competent, safe and nurturing parenting to these children.
Neither' parent has been able or willing to employ the parenting methods to which they have been exposed by the kind Safe Program for the benefit of their children. Neither parent has been able or willing to alter their antisocial and criminal behaviors or to maintain stable income and appropriate housing.
Neither parent has been able or willing to put their children's interest ahead of their own. Neither parent has been able or willing to provide stable, nurturing and a safe living environment which these children have enjoyed with their foster parents for the past two years.
7. The extent to which a parent has been prevented from maintaining ameaningful relationship with the child by the unreasonable act or conductof the other parent of the child, or the unreasonable act of any otherperson or by the economic circumstances of the parent.
Neither the unreasonable act or conduct of the other parent of the children nor the unreasonable act of any other person nor the economic circumstances of a parent has prevented Catherine G. or Miguel G. from maintaining a meaningful relationship with their children. Mother and father have no one to blame but themselves for permanent removal of these three children from their lives. CT Page 13303
 VIII. CONCLUSION
This Court finds by clear and convincing evidence that termination of the parental rights of both of the parents of Keven, Alexis and Dessiree is in said children's best interest. The children have resided in their current foster home for txvo years and have become defacto members of the family. The foster parents have provided the appropriate degree of love and affection and discipline to bring order and stability into the lives of these young children which were characterized by violence, chaos, deprivation and squalor, before their final removal from their parents' dangerous and unhealthy environment.
The Foster parents' plan to adopt all three children and to make them de jure permanent members of their family. Such desirable stability and permanency is long overdue.
 IX. ORDERS
The Court orders that: The parental rights of Catherine G. because of her failure to achieve that degree of rehabilitation referred to in section 17a-112 (j) (3) (B) (i), be and are hereby terminated with respect to the three children Keven, Alexis and Dessiree.
The parental rights of Miguel G. based on his consent accepted by this Court on June 14, 2002, be and are hereby terminated with respect to said children.
The Commissioner of the Department of Children and Families is hereby appointed statutory parent for each of the three children who shall submit to the Superior Court for Juvenile Matters at Willimantic within 30 days of the date of this judgment, a case plan, and, thereafter, such further reports as may be required by law until adoption by the foster parents is achieved. CT Page 13304